UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

DOMINION EXPLORATION & PRODUCTION, INC., ET AL.  CIVIL ACTION

VERSUS                                            NO. 07-9492

DELMAR SYSTEMS, INC., ET AL.                      SECTION "A"(1)

## ORDER AND REASONS

Before the Court is a **Motion for Partial Summary Judgment (Rec. Doc. 176)** filed by defendant/counterclaimant Delmar Systems, Inc.  Plaintiffs, Dominion Exploration & Production, Inc., et al., oppose the motion.  The motion, set for submission on October 31, 2012, is before the Court on the briefs without oral argument.[1]  For the reasons that follow, the motion is GRANTED IN PART AND DENIED IN PART as explained below.

I.   **BACKGROUND**

   *A.   Factual Background*

This lawsuit involves an incident that occurred on the Outer Continental Shelf ("OCS") off the coast of Louisiana.  Plaintiff

---

[1] The Court had originally scheduled this motion for oral argument but after further review of the memoranda the Court decided that oral argument would not be helpful in light of the issues presented.
   On October 23, 2012, the Court ordered supplemental briefing with the final supplement due on November 7, 2012 (Rec. Doc. 223).

Dominion Exploration & Production, Inc. ("Dominion") is an oil and gas exploration and production company and was at all times pertinent the majority owner of Well #2 in the Gulf of Mexico. (Second Amend. Comp.[2] ("SAC") ¶ 8).  During the summer of 2005, Dominion and defendant Delmar Systems, Inc. ("Delmar") began discussions about a mooring system for an offshore semi-submersible drilling rig.  (SAC ¶ 12).  Delmar is engaged in the business of providing mooring systems for offshore drilling rigs. (SAC ¶ 10).  On October 13, 2005, Delmar issued a written proposal to Dominion for the rental of a preset mooring system ("the Mooring System") for the Noble AMOS RUNNER, which was to be used for exploration and production operations at Well #2 on the OCS.  (SAC ¶ 14).  On December 5, 2005, Dominion and Delmar entered into an offshore Master Service Contract ("the MSA") pursuant to which Delmar was to provide services to Dominion. (SAC ¶ 13).  Beginning on September 6, 2006, Delmar installed the Mooring System on location at Well #2.  (SAC ¶ 15).  The AMOS RUNNER arrived at the Well #2 location on March 9, 2007, and was thereafter tethered to the Mooring System.  (SAC ¶ 16).

---

[2] Dominion owns a 53.3335 percent interest in Well #2. Plaintiff Statoil owns 26.666 percent of the well and plaintiff Anadarko owns 20 percent of the well.  (SAC ¶ 8).  Statoil obtained its interest in the well from Hydro Gulf of Mexico, LLC, the entity that owned the 26.666 percent interest in the well at the time of the incident at issue.  (SAC ¶ 22).  For simplicity, the Court will refer to all plaintiffs in the singular as "Dominion."

On April 24, 2007, at approximately 3:30 a.m., the Mooring System failed. (SAC ¶ 18). The segment of the Mooring System that failed was a 2000 foot long 6.3 inch polyester mooring rope provided by Delmar and manufactured by Brazilian defendant Cordoaria Sao Leopoldo, SA ("CSL"). (SAC ¶ 19). Dominion contends that the Mooring System failed due to manufacturing defects in the rope incorporated by Delmar into the Mooring System, and that those defects existed at the time of delivery. According to Dominion, the failure of the CSL rope within the Mooring System caused an asymmetric mooring configuration, which in turn caused the AMOS RUNNER to drift off location. (Pla. Opposition, Rec. Doc. 204, Exh. 1 ¶ 13). Because of the drifting, the crew of the AMOS RUNNER was required to implement an emergency disconnect of the drill string and lower marine riser package in order to avoid a blowout of the well. (Id.). Between April 24, 2007, and June 16, 2007, the Mooring System was under repair and was unusable. (SAC ¶ 21). But because Well #2 had been producing at the time of the incident, MMS regulations necessitated that the AMOS RUNNER remain on site. (Pla. Opposition, Rec. Doc.204, Exh. 1 ¶¶ 18-19). Dominion claims about $50 million in damages due to the failed Mooring System and attributes the failure to a preexisting defect in the mooring rope.

**B.    *Procedural Background***

On December 13, 2007, Dominion filed suit against Delmar and CSL.  The SAC, filed on March 15, 2010, alleges that 1) Delmar breached the implied warranties and express warranties under Sections 1 and 14(b) of the MSA by providing an inherently defective mooring system which failed during its intended use; 2) Delmar breached the MSA by providing a mooring system that failed, and Delmar failed to perform under the MSA "in a good and workmanlike manner and to the full and complete satisfaction of" Dominion.  (SAC ¶ 42); 3) Delmar is strictly liable under the Louisiana Products Liability Act; 4) Delmar was negligent in its failure to adequately test the Mooring System prior to delivery; and 5) Delmar was unjustly enriched when Dominion erroneously paid over $3 million to satisfy invoices for repair work to the Mooring System.

On April 3, 2008, just days after answering the lawsuit, Delmar moved for summary judgment raising the same substantive arguments that are at issue in this motion.  (Rec. Doc. 17). Judge Fallon denied the motion without prejudice after concluding that the motion was premature absent further factual development via discovery.  (Rec. Doc. 31).

Although the case is now nearly five years old, discovery and motion practice to date have focused on CSL's challenge to personal jurisdiction.  According to Dominion, the substantive

fact-based discovery that Judge Fallon thought essential to consideration of Delmar's motion has not yet commenced. (Pla. Oppo., Rec. Doc. 204, at 1).

## II. **DISCUSSION**

### A. *Delmar's Motion for Summary Judgment*

Delmar now reurges its previous motion for summary judgment. Delmar's motion for summary judgment seeks two forms of relief, both grounded in the contractual terms of the parties' MSA. First, Delmar moves for summary judgment on all of Dominion's damage claims. This aspect of the motion is grounded on the contention that the express terms of the MSA--specifically the indemnity provision, the consequential damages waiver, and the warranty limitation provision--preclude the precise elements of damage that Dominion is seeking to recover. Delmar maintains that the sole remedy available to Dominion for the failure of the Mooring System is the exclusive remedy provided by the warranty limitation provision of the MSA.

Second, Delmar moves for summary judgment on its counterclaims against Dominion for defense and indemnity on the claims that Dominion brought against Delmar in the main demand. As a practical matter this aspect of the counterclaim is one for reimbursement of the attorney's fees that Delmar has incurred

defending Dominion's claims in the main demand.[3]

### B. Law and Analysis

Dominion makes a convincing argument that even with the passing of over four years since the prior district judge first denied Delmar's motion for summary judgment, little progress has been made toward the merits-based discovery that the judge alluded to when characterizing Delmar's motion as "premature." (Rec. Doc. 31, at 3). And for that reason the Court will deny many aspects of Delmar's re-urged motion for summary judgment. But one issue that the Court is persuaded is ripe for determination is whether maritime law or state law governs the claims between Dominion and Delmar. The parties clearly consider this a threshold issue, the resolution of which could affect the viability of Dominion's claims against Delmar. Dominion takes the position that state law should apply to the MSA, and if it does, then Dominion maintains that the indemnity provisions that Delmar relies upon in defense of the suit are unenforceable, notwithstanding that this case does not involve death or bodily injury, and therefore is not affected by the Louisiana Oilfield Anti-Indemnity Act ("LOAIA"). Delmar's positions is that maritime law applies to the MSA and that under maritime law all

---

[3] Delmar is also seeking to recover $2,135,682.70 in overdue invoices as part of its counterdemand against Dominion. This claim for past due invoices is not at issue in the instant motion. (Def. Memo., Rec. Doc. 176-1, at 6 n.21).

aspects of the indemnity obligations are enforceable.

### 1. Does State Law or Maritime Law Govern the MSA?

Dominion invoked subject matter jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1333, et seq., when filing suit in this Court.[4] (SAC ¶ 6). OCSLA vests the district courts of the United States with jurisdiction of cases and controversies arising out of, or in connection with, any operation conducted on the OCS which involves exploration, development, or production of the minerals, of the subsoil and seabed of the OCS. 43 U.S.C.A. § 1349(b)(1)(A) (West 2007). Without question, this case falls within OCSLA's broad jurisdictional grant, without regard to whether maritime law governs the claims and without regard to whether the Court's admiralty jurisdiction might have also provided a basis for subject matter jurisdiction. See Texaco Explor. & Prod., Inc. v. AmClyde Engr. Prods. Co., 448 F.3d 760, 768 (5th Cir. 2006).

OCSLA contains a statutory choice of law provision:

> The Constitution and laws and civil and political jurisdiction of the United States are extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purpose of exploring for, developing, or producing resources therefrom . . . to the same extent as if the outer Continental Shelf were an area of exclusive Federal

---

[4] Dominion alternatively asserts diversity jurisdiction. (SAC ¶ 6). The jurisdiction of a federal court to entertain this suit is not in dispute.

>   jurisdiction located within a State.

43 U.S.C.A. § 1333(a)(1) (West 2007).

>   To the extent that they are applicable and not
>   inconsistent with this subchapter or with other Federal
>   laws and regulations of the Secretary now in effect or
>   hereafter adopted, the civil and criminal laws of each
>   adjacent State . . . are declared to be the law of the
>   United States for that portion of the subsoil and seabed
>   of the outer Continental Shelf, and artificial islands
>   and fixed structures erected thereon, which would be
>   within the area of the State if its boundaries were
>   extended seaward to the outer margin of the outer
>   Continental Shelf . . . .

Id. § 1333(a)(2)(A).  The MSA itself also contains a choice of law section:

>   Where any services, products, materials, supplies, or
>   equipment are to be provided in a geographic location
>   covered by the General Maritime law, ***the General Maritime
>   laws of the United States shall apply.  Such General
>   Maritime law shall govern the validity, interpretation,
>   and performance of [the MSA].***

(Rec. Doc. 100-2 ¶ 11) (emphasis added).  But when triggered, OCSLA's Congressionally-mandated choice of law scheme will override the parties' contractually-designated choice of law.  AmClyde, 448 F.3d  772 (citing Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473 (1981); Union Tex. Pet. Corp. v. PLT Eng'g, Inc., 895 F.2d 1043, 1050 (5th Cir. 1990)).  Thus, the parties' contractual choice of law provision will be rendered nugatory if OCSLA mandates that state law applies to the contract.

    Of course coverage by OCSLA does not perforce entail application of state law.  See Demette v. Falcon Drilling Co., 280 F.3d 492 (5th Cir. 2002), overruled on other grounds by Grand

Isle Shipyard, Inc. v. Seacor Marine, LLC, 589 F.3d 778, 783 (5th Cir. 2009). In this circuit, courts apply a three-part test to determine whether the law of the adjacent state governs as "surrogate federal law" under OCSLA's choice of law provision: 1) the controversy must arise on a situs covered by OCSLA, 2) federal maritime law must not apply of its own force, and 3) the state law must not be inconsistent with federal law. Ace Am. Ins. Co. v. M-I, LLC, -- F.3d --,2012 WL 5077684, at *2 (5th Cir. Oct. 19, 2012); Grand Isle, 589 F.3d at 783 (quoting PLT Eng'g, 895 F.2d at 1047). Thus, if maritime law applies of its own force, then OCSLA will not mandate that the claims be governed by state law.

In a breach of contract case, maritime law applies of its own force when the contract sued upon is a maritime contract. See Alleman v. Omni Energy Servs. Corp., 434 F. Supp. 2d 405, 409-11 (E.D. La. 2006) (Vance, C.J.). In determining whether state law applies in an OCSLA action predicated on a contract, it is permissible to consider whether the contract at issue is a maritime contract before considering whether the OCSLA situs requirement has been established. Grand Isle, 589 F.3d at 789 n.9. Thus, if the contract sued upon is a maritime contract then maritime law applies and state law has no application so that the situs question need not be answered. Id.

Determining whether a contract relating to offshore drilling

9

is maritime in nature is often a confusing "perplexing affair." Demette, 280 F.3d at 500 (quoting Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 315 (5th Cir. 1990)); Norfolk S. Ry. Co. v. James N. Kirby Pty Ltd., 543 U.S. 14, 23 (2004)(quoting Kossick v. United Fruit Co., 365 U.S. 731, 735 (1961) ("The boundaries of admiralty jurisdiction over contracts--as opposed to torts or crimes--being conceptual rather than spatial, have always been difficult to draw."). Courts in this circuit are guided by the test enunciated in Davis & Sons v. Gulf Oil, and the Supreme Court's more recent decision in Norfolk Southern Railway Co. v. James N. Kirby Pty Ltd., when evaluating whether a contract is maritime in nature.

Whether a contract constitutes a maritime contract depends on the "nature and character of the contract," rather than on its place of execution or performance. Davis, 919 F.2d at 316 (quoting N. Pacific S.S. Co. v. Hall Bros. Marine Ry. & Shipbldg. Co., 249 U.S. 119 (1919); Kossick, 365 U.S. at 731); Norfolk, 543 U.S. at 24. The "true criterion" is whether the contract has "reference to maritime service or maritime transactions." Norfolk, 543 U.S. at 24 (quoting N. Pacific, 249 U.S. at 125). In a contract case, the court cannot simply look to whether a ship or other vessel was involved in the dispute. Norfolk, 543 F.3d at 23. Even a contract for offshore drilling services that does not mention any vessel is maritime if its execution requires

the use of vessels.  Demette, 280 F.3d at 500-01.  The court considers the contract's "historical treatment in the jurisprudence" as well as the specific facts of the case. Demette, 280 F.3d at 500 (citing Davis, 919 F.2d at 315).  For some categories of contracts, the historical treatment is sufficiently clear such that the fact-specific inquiry becomes less important.[5]  Id.  In the context of oil and gas exploration on the OCS, maritime law will apply only if the case has a sufficient maritime nexus wholly apart from the situs of the relevant structure in navigable waters.  Laredo Offshore Constr., Inc. v. Hunt Oil Co., 754 F.2d 1223, 1230 (5th Cir. 1985).  In the context of contract disputes, precedent precludes the application of maritime law except in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction.  Id. (citing Kossick, 365 U.S. at 736-38).

---

[5] In Davis the Fifth Circuit listed six factors to consider as part of the fact-specific inquiry:  1) What does the specific work order in effect at the time of the injury provide? 2) What work did the crew assigned under the work order actually do? 3) Was the crew assigned to work aboard a vessel in navigable waters? 4) To what extent did the work being done relate to the mission of that vessel? 5) What was the principal work of the injured worker? 6) What work was the injured worker actually doing at the time of the injury?  919 F.2d at 316.  Davis involved contractual indemnity based on an underlying personal injury (death) tort claim, and hence the references to "injury" in the factors.

Turning now to the dispute between Dominion and Delmar, it is undisputed that all of the work that gave rise to this lawsuit was performed pursuant to the MSA.[6]  In fact, several of Dominion's claims are grounded specifically on various breach of contract theories.

Also undisputed is the "legal fact" that the AMOS RUNNER, which is a semi-submersible drilling rig, is a vessel under the law of this circuit.  Mooring a vessel on navigable waters is a quintessential maritime activity.  The damages at issue in this case arose out of the failure of the Mooring System and the vessel having drifted off location in the aftermath of the failure.  It would seem then to be an irrefragable conclusion that the MSA, a contract whose primary focus is the mooring of vessel on navigable waters, is a maritime contract governed by maritime law.

To the extent that there is any doubt as to whether maritime law governs the MSA, that doubt arises out of the additional

---

[6] As is the common practice in the oil and gas industry, Dominion and Delmar's contractual relationship for the project that gave rise to this lawsuit was created in two stages.  The parties' MSA is a "blanket contract" or master services agreement that constituted the first stage of the contractual relationship.  Work orders for the performance of specific work were subsequently issued to form stage two of the agreement.  When the parties' agreement consists of two parts—-the blanket agreement and a subsequent work order--the two must be interpreted together when determining whether maritime law governs the contractual dispute.  Grand Isle, 589 F.3d at 787 n.6; Davis, 919 F.2d at 315-16; Ace Am. Ins., 2012 WL 5077684, at *3-4.

"legal fact" that the AMOS RUNNER was also an OCSLA situs.  In Demette v. Falcon Drilling, the Fifth Circuit specifically addressed the question of whether a movable jack-up rig, which is a vessel, loses its vessel status when its also qualifies as an OCSLA situs.  The majority opinion demonstrates that vessel status and OCSLA situs status are not mutually exclusive states.  The end result in that case was that maritime law applied to the contractual dispute of its own force, so OCSLA, which was clearly applicable to the case, did not apply state law to the dispute.  Demette, 280 F.3d at 500.  The need for OCSLA's state law gap-filling function was not triggered because the rig in question was a vessel subject to maritime law.  See id. at 504 n.52.  A movable rig subject to maritime law does not suffer from the same "lawless limbo" that would affect fixed platforms in the absence of OCSLA's choice of law mandate.  Id.

Judge DeMoss wrote a vigorous dissent in Demette.  The crux of his dissent was that in the realm of OCSLA, it is invalid to continue to treat movable rigs as vessels, particularly when they are jacked up on the seabed and actively involved in the production of oil and gas on the OCS.  Demette, 280 F.3d at 507-08 (DeMoss, J., dissenting).  According to Judge DeMoss, the legislative history behind OCSLA as well as the Supreme Court cases interpreting it, made the majority's adherence to the vessel distinction for movable rigs, and the concomitant

application of maritime law, untenable.  Id.

Demette was later overruled in part by Grand Isle Shipyard v. Seacor Marine, but only to the extent that it suggested that the law applicable to an underlying tort, as determined by the situs of the tort, dictates the law that applies to a contractual indemnity dispute arising out of that tort.  Grand Isle, 589 F.3d at 788 & n.8 ("[A]nd with respect to the extent (and only to that extent) the 'tort' analysis was used in those cases to determine situs, we disagree and overrule that portion of those opinions.").  Thus, Demette remains good law in this circuit and serves as a cynosure in this case, quelling any suggestion that OCSLA somehow operates to deprive a movable rig like the AMOS RUNNER of vessel status when it also qualifies as an OCSLA situs.

In support of its contention that OCSLA applies state law to this dispute, Dominion emphasizes to the Court that the AMOS RUNNER was not simply a moored vessel in the traditional maritime sense because its mooring gear utilized suction piles that were driven into the seabed.  Dominion contends that once it was tethered to the mooring system, the AMOS RUNNER was no different than a fixed platform.  Dominion also emphasizes that the AMOS RUNNER was actively engaged in oil and gas exploration/production when the mooring system failed, and that offshore drilling is not a traditional maritime activity.  In light of these facts, Dominion contends that Texaco Exploration v. AmClyde, which was

14

decided after <u>Demette</u>, controls here and compels the conclusion that OCSLA applies state law to this dispute in place of maritime law.

At its core, <u>AmClyde</u> simply held that the specific causes of action asserted in that case were insufficiently connected to maritime activity to support the conclusion that maritime law applied to the claims of its own force. 448 F.3d at 771. <u>AmClyde</u>, which was authored by Judge DeMoss who had dissented so vigorously in <u>Demette</u>, clarified how to gauge the strength of the maritime nexus to specific causes of action in a case that involves non-maritime activities and obligations in addition to maritime activities and obligations. Although the overall project in <u>AmClyde</u> did involve numerous maritime obligations, the specific damage-causing incident being sued upon--a crane equipment failure that caused a pre-fabricated section of a fixed platform to fall into the Gulf of Mexico--was not a traditional maritime activity, and the traditional maritime activities that were part of the project were not involved in the incident. Given these facts and in light of OCSLA's legislative history that suggested that Congress did not intend for maritime law to apply to incidents occurring on a fixed platform OCSLA situs, the panel concluded that the district judge had erred in applying maritime law to the dispute. <u>AmClyde</u>, 448 F.3d at 771-72.

This Court is persuaded that <u>AmClyde</u> does not insinuate

15

state law into this case.  AmClyde did not overrule the long-standing law in this circuit that OCSLA notwithstanding, maritime law prevails when it applies of its own force.  And it certainly does not overrule the vessel distinction for movable rigs that Demette identified--the platform in AmClyde was a fixed platform so the case did not involve an OCSLA situs that was also a vessel under maritime law.  AmClyde bears directly on cases that involve both maritime and non-maritime activities, and teaches that when OCSLA is involved, the maritime connection of the specific activity giving rise to the claim cannot merely be tangential.

But in this case the connection to maritime activity is substantial, not merely tangential.  This case does not involve activities that bear a relationship to maritime activity simply by virtue of the fact that the activity occurred on navigable water.  Rather, this case involves the mooring of a vessel, which is a traditional maritime activity, and the damages in this case arose from the failure of a mooring system that allowed the vessel to drift off location.  The damages in this case did not arise out of an activity unique to oil and gas exploration--for instance, the mooring system did not fail because the well experienced a blowout--but rather because an allegedly defective rope in the Mooring System failed, which is something that falls in the ambit of maritime activity.  So in stark contrast to AmClyde, this case does not involve damages arising out of a

traditionally non-maritime activity whose only nexus to maritime activity was the incident's location on navigable water, and the necessity of other maritime activities to complete the project as a whole.  AmClyde does not stand for the proposition that OCSLA functions to transmogrify a movable rig from a vessel to a fixed platform once it's tethered and  actively begins oil and gas production.  To apply AmClyde in such a manner would be contrary to the law of this circuit.[7]

In sum, the contract between Dominion and Delmar is governed by maritime law and maritime law governs Dominion's claims against Delmar.  OCSLA does not apply Louisiana state law to the dispute.  Delmar's motion is therefore GRANTED to the extent that Delmar moves for a ruling that maritime law governs Dominion's claims.

### 2. *Delmar's Remaining Contentions*

The remainder of Delmar's motion for summary judgment on Dominion's claims is DENIED without prejudice.  For nearly five years Dominion and Delmar have argued their respective positions regarding whether maritime law governs this dispute and today the Court's ruling puts that issue to rest for the remainder of this

---

[7] In Hamm v. Island Operating Co., the Fifth Circuit reiterated in an unpublished per curiam opinion that circuit precedent recognizes that OCSLA and its choice of law provision were not intended to displace general maritime causes of action whenever a court has OCSLA jurisdiction.  450 Fed. Appx. 365 (5th Cir. 2011) (unpublished) (citing Tenn. Gas Pipeline v. Houston Cas. Ins. Co., 87 F.3d 150, 154 (5th Cir. 1996)).

litigation.  The parties may now more efficiently focus their efforts on the question of whether the application of maritime law really means as much as Delmar contends that it means.  For instance, under maritime law the MSA's indemnity provisions might very well be enforceable but the Court has serious reservations regarding Delmar's contention that the indemnity provisions can reasonably be read in the manner that Delmar suggests with respect to its own alleged breach of contract.  On the other hand, the MSA contains a valid and enforceable consequential damages waiver that will limit the elements of recovery that Dominion could hope to obtain from Delmar, assuming that Dominion ultimately proves liability.

The motion is DENIED outright insofar as Delmar seeks summary judgment against Dominion on its counterclaims for defense and indemnity.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Partial Summary Judgment (Rec. Doc. 176)** filed by defendant/counterclaimant Delmar Systems, Inc. is **GRANTED IN PART AN DENIED IN PART** as explained above.

December 3, 2012

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE