UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


DOMINION EXPLORATION & PRODUCTION, INC., ET AL.      CIVIL ACTION


VERSUS      NO. 07-9492


DELMAR SYSTEMS, INC., ET AL.      SECTION "A"(1)


## ORDER AND REASONS

Before the Court is a **Motion for Summary Judgment To Dismiss Plaintiffs'
Claims Under Terms of the Master Service Contract and for Lack of Causation
(Rec. Doc. 284)** filed by defendant/counterclaimant Delmar Systems, Inc. Plaintiffs,
Dominion Oklahoma Texas Exploration & Production, Inc., *et al.*, oppose the motion.
The motion is before the Court on the briefs without oral argument.[1] For the reasons
that follow, the motion is GRANTED IN PART AND DENIED IN PART.

I.    **Background**

A detailed factual background for this case is contained in the Court's Order and
Reasons entered on December 3, 2012 (Rec. Doc. 230). It suffices for present

---

[1] Delmar has requested oral argument but the Court is not persuaded that argument
would be helpful in light of the issues presented.

purposes to note that this lawsuit involves an incident that occurred on the Outer

Continental Shelf off the coast of Louisiana. Pursuant to a contract with Plaintiffs,

Delmar provided a nine-point offshore mooring system for the AMOS RUNNER. One of

the ropes used in the mooring system — specifically, the rope that served as leg #2 in

the system — failed, and the AMOS RUNNER drifted off location ultimately causing

Plaintiffs significant damages.[2]  The rope that failed was manufactured by Brazilian

defendant Cordoaria Sao Leopoldo, SA ("CSL"). It is undisputed that this specific

polyester rope was manufactured by CSL years earlier as part of a joint interest

program involving several companies that were interested in field testing polyester

ropes for offshore mooring systems. (Rec. Doc. 294, Exh. 6 Letter Agreement).

Plaintiffs' expert has examined the failed rope and attributes its failure to end splicing

that occurred when CSL manufactured the rope — a manufacturing practice that would

have rendered the rope essentially useless for its intended purpose. In October 2014

Plaintiffs settled their claims with CSL for a relatively minor amount of money in

comparison to the near $50 million in damages that they allege in connection with the

failed mooring system.

 Delmar moves for summary judgment on all of Plaintiffs' claims. First, Delmar

points out that all of its work for Plaintiffs was performed pursuant to the December 5,

---

[2]  Beginning on September 6, 2006, Delmar installed the mooring system on location. On March 9, 2007, the AMOS RUNNER arrived at the well location and was attached to the mooring system. On April 24, 2007, the mooring system failed. (Rec. Doc. 296, Plaintiffs' Opposition).

2005 Master Service Contract ("MSA") in place between the parties. Delmar contends that four primary contractual provisions in the MSA protect it from the damage claims alleged by Plaintiffs in this lawsuit. Delmar stresses that Plaintiffs are sophisticated business parties and that the damage limitations in the MSA were negotiated specifically in light of the risks inherent in deepwater operations, the relative size of the companies involved, and the rates that Delmar charged. Delmar argues that allowing Plaintiffs to escape their obligations under the MSA would void the bargain reached by the parties and eviscerate one of the primary causes of Delmar's agreement to provide deepwater mooring services to Plaintiffs in the first place.

Second, Delmar argues that many of the elements of damages claimed by Plaintiffs were not proximately caused by Delmar, and are therefore not recoverable regardless of the applicability of any contractual limitations.

**II.    Discussion**

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," when viewed in the light most favorable to the non-movant, "show that there is no genuine issue as to any material fact." *TIG Ins. Co. v. Sedgwick James*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 248). The court must draw all justifiable inferences in favor of the non-moving party. *Id.* (citing *Anderson*, 477 U.S. at 255). Once the moving party has initially

shown "that there is an absence of evidence to support the non-moving party's cause," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-movant must come forward with "specific facts" showing a genuine factual issue for trial. *Id.* (citing Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)). Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial. *Id.* (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)).

The Court has already ruled that maritime law governs this dispute between Plaintiffs and Delmar. (Rec. Doc. 230). Thus, to the extent that the MSA's various waivers and damage limitations apply, they are enforceable. Plaintiffs do not contend otherwise. Further, although Delmar raised many of the same arguments before the Court today as in its prior motion for partial summary judgment (Rec. Doc. 176), the Court denied relief without prejudice. (Rec. Doc. 230 at 17). Therefore, the Court's prior ruling does not foreclose any aspect of Delmar's present motion for summary judgment, and as the parties will note, some of the Court's initial impressions of the MSA have evolved over the last four years since the Court first considered it.

The Court recognizes that Delmar's position in this case is that it played no role whatsoever in the failure of the mooring system's leg #2 (the CSL rope). Delmar's theory is that some external force cut or damaged the rope either after the AMOS RUNNER was brought on site or during the six month interim that elapsed from the time Delmar preset the system to the time when the AMOS RUNNER finally arrived for mooring. The actual cause of the rope's failure is a disputed issue of fact that is not

presented in Delmar's motion.

Furthermore, Delmar does not move for summary judgment on the issue of whether it committed a breach of contract by incorporating the used CSL rope into the mooring system. Delmar's Bid #2599 does suggest that three new 800 ton polyester ropes would be purchased at $115,000.00 each for legs 2, 6, and 7 of the mooring system. (Rec. Doc. 296-3, Exh. 2). Plaintiffs' understanding that all new ropes would be used was not an unreasonable one in light of the deposition testimony of Delmar's lead engineer John H. Williams. Williams confirms that the original plan was to have all new polyester ropes in the system. (Rec. Doc. 296-4, Exh. 3 at 136). Yet it is now known that leg #2 of the system, which is the leg that failed, was not a new rope but instead a used rope left over from the CSL joint interest field test program. Thus, the Court assumes for present purposes that at the very least a breach of contract did occur when Delmar incorporated the CSL rope into the mooring system. Of course even with a technical breach of contract, if the evidence at trial establishes that Delmar's fault is not the proximate cause of Plaintiffs' damages, *i.e.*, that the rope did not fail but instead was severed by an external force in the Gulf, then Plaintiffs recovery will be severely limited.[3]

---

[3] Even if an external force beyond Delmar's control cut the rope the Court questions whether the used CSL rope was more vulnerable to severing because of any inherent defects in the rope.

### A.    The MSA

The Court now turns to each of Delmar's contentions regarding the MSA. Although Delmar's motion invites the Court to parse through Plaintiffs' detailed list of damages, the Court declines to do so in light of the fact-intensive nature of the damages determination. But the following general rulings regarding the MSA will govern any damages determination that the Court makes in conjunction with the trial.

### 1.    *Section 14(d) of the MSA*

Delmar contends that § 14(d) of the MSA forecloses all of Plaintiffs' claims for damages.

Section 14 of the MSA pertains to Warranties. (Rec. Doc. 284-5, Exh. BC-1). In subpart 14(a) Plaintiffs agreed to waive the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. "The remedies of [Plaintiffs] for any breach of warranty shall be limited to those provided herein." Express warranties are provided in subparts 14(b) and (c). Subpart 14(d) of the MSA provides the "sole and exclusive remedy" such that if it is discovered that the *goods sold or design/engineering services* rendered fail to conform to Delmar's representations, then Plaintiff's sole and exclusive remedy shall be repair/replacement with no other liability for any other costs and expenses. (*Id.* at 9).

Plaintiffs do not dispute that the MSA applies to all "service and work" for the mooring system project. But according to Plaintiffs, § 14(d) does not apply on its own terms because Delmar *rented* the mooring system to Plaintiffs so no goods were

actually sold to Plaintiffs in the transaction. Plaintiffs' position is that Bid #2599, which called for new ropes, is a standalone contract that does not pertain to goods sold or design/engineering services rendered — the specific factual predicate required by the plain text of § 14(d). Plaintiffs point out that § 14(d) does not employ the broader language referencing all "service and work" that is used in other sections of the MSA. Plaintiffs argue that the different contractual language must be given effect, and that no unfairness can result because Delmar actually drafted § 14(d) for inclusion in the MSA.

Delmar, on the other hand, argues that no significance should attach to the fact that the mooring system equipment was rented as opposed to being sold because the mooring system project was far broader than the equipment rental reflected in Bid #2599. Delmar points out that the overall services provided on the mooring system project as a whole did include design and engineering services, and the rental of the equipment was just one aspect of Delmar's services on the project. Delmar argues that not covering the equipment rental under the subpart 14(d) exclusive remedy provision simply ignores the fact that the rental of the mooring system was part and parcel of Delmar's services for this particular job.

The Court's task in resolving these competing contentions is a difficult one because both sides raise valid points and neither position is unreasonable. Even though Delmar performed engineering and design services in conjunction with the nine-point mooring system, there has been no allegation in this case that the system's failure was attributable to any deficiency in this area. On the contrary, the allegation is that if the

system had been equipped in accordance with the design and specific equipment proposal that Delmar gave Plaintiffs, then the failure would not have occurred. The Court finds Plaintiffs' position, which relies on a straightforward reading of the MSA's plain text, to be more reasonable, at least insofar as damages resulting from a breach of contract are concerned.[4]

### 2. Consequential Damages

Delmar argues that Plaintiffs expressly waived all potential claims for consequential damages yet the overwhelming majority of the $42 million that Plaintiffs seek to recover is for costs and expenses that are "consequential" in nature.

Plaintiffs waived recovery for any consequential damages pursuant to § 21 of the MSA. Plaintiffs do not contend otherwise. The dispute regarding this provision involves how broadly the term "consequential damages" is defined. Plaintiffs deny that they are attempting to recover any type of purely economic loss such as damages attributable to loss of production or loss of profits. They argue that their damages are based on actual expenses that they incurred to bring themselves to a position that they would have been in had the rope not failed.

The Court agrees that Delmar's position relies on too broad a reading of the consequential damages waiver. The Court is not suggesting that Delmar's arguments lack merit but they fall more appropriately under the rubric of proximate cause, not under the more narrow

---

[4] The Court refers specifically to breach of contract because Delmar's contention regarding claims for breach of warranty are not so easily dismissed. Regardless of the factual predicate contained in the exclusive remedy provision of subpart 14(d), subpart (a) specifically provides that the remedy for *any* breach of warranty is limited to those provided herein, in other words in § 14(d).

concept of consequential damages.

### 3.    Force Majeure

Delmar contends that many of the costs and expenses that Plaintiffs seek to recover are precluded by the MSA's force majeure provision because those costs were due to causes and events beyond Delmar's control.

Certain aspects of Plaintiffs' expenses may very well trigger the MSA's force majeure provision in § 22 of the MSA. It is the Court's understanding that Plaintiffs' expenses and costs in the aftermath of the rope failure were in many ways increased by third-party equipment shortages, governmental (MMS) regulations, and weather events. The Court recognizes that Plaintiffs would not have incurred any of these costs if leg #2 of the mooring system had not failed but it remains that some of Plaintiffs' additional expenses might be attributable to causes beyond Delmar's control. Whether Delmar should ultimately be liable for those expenses really presents an issue of proximate cause to be determined at trial.[5]

### 4.    Property Damage—Indemnity

Delmar contends that Plaintiffs' property damage claims (including damage to the

---

[5] The Court found the parties' competing arguments regarding the effect of loop currents in the Gulf somewhat confusing in the context of the force majeure argument. The Court gathered from Delmar's briefing that its position was that it should not be liable for any delays in resetting the AMOS RUNNER that were attributable to loop currents because this force of nature would be an act of God covered by the force majeure waiver. But Plaintiffs' argument in opposition — that the mooring system had been designed specifically to withstand loop currents — seemed to be directed at defending an allegation that loop currents had played some role in the failure of the mooring system.

well, damages to Schlumberger's subsea test tree, the BOP, lost fluids and tools) are barred by § 4(f) of the MSA, the indemnity or hold harmless provision, because Plaintiffs expressly assumed the risk for damage to their own property and that of their contractors and subcontractors.

Plaintiffs point out that Delmar is actually seeking indemnity for its own breach of contract and that interpreting § 4(f) to allow Delmar to be indemnified for its own breach of contract would be unreasonable. Further, Plaintiffs contend that the reciprocal indemnity provision in § 4(d) in favor of Plaintiffs serves to cancel out the indemnity provision in § 4(f).

The Court does not read § 4(d) and § 4(f) as cancelling each other out because the Court does not read § 4(d) in the manner that Plaintiffs are interpreting it, *i.e.*, that Delmar agreed to indemnify Plaintiffs for any damage caused by Delmar's equipment (the rope). Rather, both subpart 4(d) and 4(f) are properly interpreted in the manner that Delmar suggests, which is that each party agreed to be responsible for damages to the property that it owned or leased from others, not for damages caused by the property.

Moreover, the Court is persuaded that § 4(f)'s use of the term ""other legal fault" is broad enough to encompass liability for breach of contract. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir. 1981), cited by Plaintiffs, does not hold otherwise. *Corbitt* dealt with indemnity for contractual liability, not indemnity for liability for breach of a contract.

Thus, any damage that the Court determines at trial to be fairly characterized as

"property damage" — and items such as damage to the well, Schlumberger's subsea test tree and the BOP would seem to be fairly characterized as such — will not be recoverable per subpart 4(f) of the parties' MSA. Delmar's motion is granted as to this claim.

### B.    Proximate Cause

Aside from the limitations imposed by the MSA, Delmar argues that the majority of costs and expenses claimed by Plaintiffs were not proximately caused by any fault by Delmar. Delmar argues that the majority of the damages claimed by Plaintiffs are made up of costs and expenses which would have been incurred by Plaintiffs even if the rope in leg #2 had not failed.

Delmar points out that the failed rope was repaired by April 28, 2007 yet Plaintiffs contend that their damage period extends through June 20, 2007. According to Delmar, Plaintiffs are basically trying to recover every expense that they incurred on the job during this time period. Delmar contends that even if the exclusive remedy provision of the MSA were not enforced for some reason, Plaintiffs are precluded nonetheless from recovering the $37 million in additional expenses incurred from April 29, 2007 through June 20, 2007, as these damages do not directly relate to the repair of the rope and are indirect and consequential.

Delmar will only be liable for damages proximately caused by its fault. Plaintiffs do not contend otherwise. The determination as to whether any specific item of damages was proximately caused by Delmar is a fact-intensive determination that the

Court will make following the trial on the merits.

### C.    Attorney's Fees

Delmar argues that Plaintiffs cannot recover attorney's fees. Absent a statute or enforceable contract, litigants in a maritime case generally must pay their own attorney's fees. *Texas A&M Res. Found. V. Magna Transp., Inc.*, 338 F.3d 394,405 (5th Cir. 2003) (quoting *Galveston Cty. Nav. Dist. v. Hopson Towing Co.*, 92 F.3d 353, 356 (5th Cir. 1996)). The MSA does not provide for an award of attorney's fees. Delmar's motion is granted as to this claim.

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion for Summary Judgment To Dismiss Plaintiffs' Claims Under Terms of the Master Service Contract and for Lack of Causation (Rec. Doc. 284)** filed by defendant/counterclaimant Delmar Systems, Inc. is **GRANTED IN PART AND DENIED IN PART** as explained above.

October 27, 2016

JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE